FILED
2017 Jun-06  AM 08:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRCIT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| TAMELA COSPER, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | |
| | ) | JURY DEMAND |
| AMERICAN FAMILY CARE, | ) | |
| | ) | |
| DEFENDANT. | ) | |

---

## COMPLAINT

---

## I. INTRODUCTION

Plaintiff, Tamela Cosper ("Plaintiff"), brings this complaint for legal and equitable relief to address unlawful employment practices and violations of Federal law by Defendant American Family Care, ("Defendant").

## II. JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(4) and 1367. This is a suit authorized and instituted pursuant to Title VII of the Act of Congress known as the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and the Civil Rights Act of 1866, 42 U.S.C. § 1981,

as amended. The jurisdiction of this court is invoked to secure protection for and to redress the deprivation of rights secured by 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, providing injunctive and other relief against race discrimination, and retaliation in employment.

## II. PARTIES

2.     Plaintiff, Tamela Cosper, is an African American female resident of Jefferson County, Alabama and is a citizen of the United States. Plaintiff is over the age of nineteen (19). Plaintiff was an employee of American Family Care, Defendant, when the actions of which complains took place.

3.     Defendant, American Family Care, ("Defendant") is a domestic corporation. The Defendant is engaged in business in Alabama.

4.     At all times relevant to this action, Defendant has maintained and operated a business in Alabama. Defendant is engaged in an industry affecting commerce and has fifteen (15) or more employees and is an employer within the meaning of 42 U.S.C. § 2000e (b), (g) and (h).

## III. ADMINISTRATIVE PROCEDURES

5.     Plaintiff hereby adopts and realleges paragraphs one (1) through four (4) herein above as if fully set forth herein.

6.     Plaintiff brings this action for the unlawful employment practices and

acts of intentional discrimination based on race and retaliation by her employer, Defendant.

7.      This action seeks to redress unlawful employment practices resulting from the acts of Defendant, their agents, servants, and employees committed with respect to Plaintiff's employment; and for a permanent injunction restraining Defendant from maintaining a habit and/or practice of discriminating against and/or retaliating against the Plaintiff and others similarly situated on account of racial discrimination and retaliation.

8.      On July 11, 2016, within 180 days of the last discriminatory and retaliatory act of which Plaintiff complains, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Exhibit 1).

9.      Plaintiff's Dismissal and Notice of Rights was mailed by the EEOC to the Plaintiff on March 6, 2017, and Plaintiff filed suit within ninety (90) days of receipt of her Dismissal and Notice of Rights.  (Exhibit 2).

10.     Administrative prerequisites for filing suit have been satisfied, and Plaintiff is entitled to bring this action.

## IV.  STATEMENT OF PLAINTIFF'S FACTUAL ALLEGATIONS AND CLAIMS

11.     Plaintiff hereby adopts and realleges paragraphs one (1) through ten (10) herein above as if fully set forth herein.

3

12.     Plaintiff, Tamela Cosper is an African American female.

13.     Plaintiff began working for the Defendant on or about July 16, 2012, as a Reimbursement Specialist. On or about June 29, 2014, Plaintiff was reclassified to Billing Specialist

14.     Plaintiff was terminated on or about March 18, 2016.

15.     Plaintiff's supervisor was Mark Garst, Director of Patient Billing. Mr. Garst is Caucasian.

16.     Over the course of Plaintiff's employment with Defendant, promotional positions for advancement were available. Plaintiff was qualified for these positions.

17.     Plaintiff applied for numerous open and available positions, but Mr. Garst denied Plaintiff the opportunity to interview.

18.     Caucasian applicants with less experience than Plaintiff were hired to fill every position for which Plaintiff applied.

19.     In late 2012, Plaintiff complained to Human Resources about being denied the opportunity to interview for positions and being denied promotional opportunities.

20.     After Plaintiff complained to Human Resources she began to be interviewed for positions. However, she continued to be denied promotional positions while less qualified Caucasians were promoted.

21.    Plaintiff was required to perform duties and responsibilities outside of her job description that were duties for higher paying promotional positions.

22.    Plaintiff was required to perform these additional job duties and responsibilities without any additional compensation and without receiving a promotion.

23.    After Human Resources directed Mr. Garst to allow Plaintiff to interview for available positions, Mr. Garst interviewed Plaintiff approximately two times for available supervisory positions Mr. Garst was very hostile toward Plaintiff in these interviews.

24.    Mr. Garst made racially offensive comments to Plaintiff when Plaintiff reported racial issues to him regarding offensive comments made about the Trayvon Martin shooting. Mr. Garst told Plaintiff, "You are Black, make it go away."

25.    In or around 2013, there was an opening for the position of Billing Supervisor and Plaintiff applied.

26.    The Billing Supervisor position was awarded to Talisa Rogers, Caucasian, even though Plaintiff had more experience and was more qualified.

27.    Ms. Rogers later resigned from her employment with Defendant creating an opening for a Billing Supervisor.

28.    Plaintiff applied for the Billing Supervisor position again, but the

position was given to Sherry Burrus, Caucasian.

29.     Plaintiff had more experience and was more qualified than Ms. Burrus.

30.     Plaintiff was denied the Billing Supervisor position awarded to Ms. Burrus because of her race, African American.

31.     When Plaintiff was denied the Billing Supervisor position awarded to Ms. Burrus Plaintiff complained about racial discrimination.

32.     Later, there was an opening for another Billing Supervisor.

33.     However, Mr. Garst did not advertise or post the position.

34.     Instead, Mr. Garst promised the Billing Supervisor position to Cassandra Boyd, Caucasian.

35.     Mr. Garst failed and/or refused to post or advertise as an effort to prevent Plaintiff from applying.

36.     However, Plaintiff learned of the open and available Billing Supervisor position and applied.

37.     Plaintiff complained to Mr. Garst about being overlooked for positions and that she was just as qualified, if not more qualified, than the Caucasian employee Ms. Boyd.

38.     Plaintiff was reluctantly given the Billing Supervisor position on or about July 13, 2014.

39.    Mr. Garst tried to talk Plaintiff out of applying for the Billing Supervisor position because he knew he would have no choice but to award the position to Plaintiff.

40.    Mr. Garst told Plaintiff, "I can't find a legitimate reason not to hire you for the job, but if you don't apply I'll give you a raise."

41.    Mr. Garst further tried to discourage Plaintiff from applying for the position and told Plaintiff, "Welcome to the world of getting screwed being on salary."

42.    After Plaintiff was hired as the Billing Supervisor Mr. Garst told her she would start as an "interim."

43.    Caucasian employees promoted to supervisory positions were not required to work as an interim employee when they were promoted.

44.    When Plaintiff was promoted to Billing Supervisor, Cassandra Boyd, Caucasian, was placed to work under Plaintiff's supervision.

45.    Cassandra Boyd was given supervisor's pay and was making more than Plaintiff, who was her supervisor.

46.    Mr. Garst gave Ms. Boyd a pay raise, when Plaintiff had not received a pay raise in approximately four years.

47.    Plaintiff complained to Mr. Garst about Ms. Boyd receiving a pay raise when she was denied a pay raise for years.

48.     Plaintiff also complained about Ms. Boyd receiving supervisor's pay and was not a supervisor.

49.     Ms. Boyd was given a pay raise because she is Caucasian.

50.     Mr. Garst hired David Sawyer, Caucasian, to work for William Whatley, an African American supervisor.

51.     Mr. Sawyer was paid more than Mr. Whatley because he is Caucasian.

52.     In or around December 2014, Plaintiff met with her immediate supervisor, Connie Henry, Assistant Director of Claims Processing.

53.     Ms. Henry reported to Mr. Garst.

54.     Ms. Henry informed Plaintiff that Mr. Garst wanted to discipline her for allegedly intimidating a coworker.

55.     Ms. Henry refused to discipline Plaintiff because the allegation was unfounded.

56.     In or around 2015, when it came time for Plaintiff's six month evaluation and pay raise, Mr. Garst refused to evaluate Plaintiff and he kept making excuses as to why he could not perform Plaintiff's evaluation.

57.     Plaintiff reminded Mr. Garst that she had not been evaluated since 2014.

58.     In or around mid 2015, Mr. Garst directed Ms. Henry, Plaintiff's immediate supervisor, to give Plaintiff low scores on her evaluation.

59.     Ms. Henry refused and Mr. Garst removed her from being Plaintiff's supervisor.

60.     Mr. Garst then required Plaintiff to report directly to him and he became Plaintiff's immediate supervisor.

61.     In or around mid to late 2015, Plaintiff was required to take over the supervision of half of Sherry Burrus' department, but was paid approximately $10,000.00 a year less than Ms. Burrus.

62.     On or about February 2, 2016, Plaintiff was approved to work from home due to inclement weather.

63.     While working from home, Plaintiff attempted to generate reports to her subordinates.

64.     Plaintiff was unable to deliver those reports due to computer network problems, and Plaintiff notified the IT Department of the network problems. Plaintiff performed additional tasks while working from home.

65.     On or about February 3, 2016, Plaintiff complained again to Human resources about being denied a pay raise when Caucasian employees performing the same or similar duties were awarded pay raises and were paid more than Plaintiff.

66.     After Plaintiff complained to Human Resources on February 3, 2016, Mr. Garst began unjustly harassing Plaintiff about her job performance.

67.    On March 18, 2016, Mr. Garst terminated Plaintiff and falsely accused Plaintiff of stealing time when she was working from home on February 2, 2016.

68.    Plaintiff performed work on February 2, 2016, and did not steal time.

69.    Plaintiff was paid as a salaried employee.

70.    Plaintiff was terminated because of her race, African American.

71.    Plaintiff was also terminated because of her complaints of discrimination and protected activity.

72.    Defendant has a habit of treating African American employees less favorably than Caucasian employees.

73.    Caucasian employees have made racially offensive comments about African American employees stating they have a "fat ass."

74.    Defendant has sent African American employees home for their clothing, but not Caucasian employees that have worn clothing inappropriate for work.

## COUNT ONE

### STATEMENT OF PLAINTIFF'S TITLE VII AND 42 U.S.C. § 1981 RACE DISCRIMINATION CLAIMS

75.    Plaintiff hereby adopts and realleges paragraphs (1) through seventy-four (74) herein above as if fully set forth herein.

76.    The conduct of Defendant violates Title VII and 42 U.S.C. § 1981

because Plaintiff was required to work in a racially discriminatory and hostile environment in which the terms and conditions of her employment were adversely affected based on her race, African American.

77.     Plaintiff, Tamela Cosper is an African American female and member of a protected group.

78.     Plaintiff began working for the Defendant on or about July 16, 2012, as a Reimbursement Specialist and there existed an employee-employer relationship between Plaintiff and Defendant.

79.     On or about June 29, 2014, Plaintiff was reclassified to Billing Specialist

80.     Plaintiff was terminated on or about March 18, 2016, because of her race, African American.

81.     Plaintiff's supervisor was Mark Garst, Director of Patient Billing.

82.     Mr. Garst is Caucasian.

83.     Mr. Garst took every opportunity to treat Plaintiff less favorably than the Caucasian employees, deny Plaintiff promotional opportunities, treat Plaintiff in a racially derogatory manner, and discriminate against Plaintiff because of her race.

84.     Plaintiff applied for numerous promotional positions and Mr. Garst denied Plaintiff the opportunity to even interview for these positions.

85.    Plaintiff was denied promotional positions and every time the positions were awarded to Caucasians.

86.    Caucasians with less experience and fewer qualifications than Plaintiff were promoted over Plaintiff.

87.    In late 2012, Plaintiff complained to Human Resources and Mr. Garst was finally required to interview Plaintiff.

88.    However, even though Mr. Garst allowed Plaintiff to interview for promotional positions, Plaintiff continued to be denied promotions because of her race and less experienced and less qualified Caucasians received these positions.

89.    Even though Plaintiff was not promoted she was still required to perform additional job duties outside of her job description. Plaintiff was not awarded any additional compensation for these additional duties and responsibilities.

90.    After Human Resources directed Mr. Garst to interview Plaintiff when she applied for positions, Mr. Garst was very hostile toward Plaintiff in the interviews.

91.    Mr. Garst made racially offensive comments to Plaintiff when Plaintiff reported racial issues to him regarding offensive comments made about the Trayvon Martin shooting. Mr. Garst told Plaintiff, "You are Black, make it go away."

92.     In or around 2013, the position of Billing Supervisor was available and Plaintiff applied.

93.     Although Plaintiff was more qualified, the position was give to Talisa Rogers, Caucasian. Plaintiff was denied this position because of her race, African American.

94.     Ms. Rogers later resigned from her employment with Defendant and the Billing Supervisor position was again available.

95.     Plaintiff applied for the position again, but the position was awarded to Sherry Burrus, Caucasian. Plaintiff was denied this position because of her race.

96.     Later, another Billing Supervisor position became available, but Mr. Garst did not advertise or post the position in an attempt to prevent Plaintiff from applying. Instead, Mr. Garst promised the position to Cassandra Boyd, Caucasian.

97.     Plaintiff learned of the available Billing Supervisor position and applied.

98.     Plaintiff complained to Mr. Garst about him favoring Caucasian employees and informed him that she was qualified for the Billing Supervisor position he promised to Ms. Boyd. Plaintiff also complained to Mr. Garst that she was being treated unfairly because he continued to overlook her for promotions that were awarded to Caucasians.

99.     Plaintiff was reluctantly given the Billing Supervisor position on or

about July 13, 2014.

100.   Mr. Garst tried to prevent Plaintiff from applying for the Billing Supervisor position and told Plaintiff, "I can't find a legitimate reason not to hire you for the job, but if you don't apply, I'll give you a raise."

101.   In his further attempts to prevent Plaintiff from applying for the Billing Supervisor position Mr. Garst told Plaintiff, "Welcome to the world of getting screwed being on salary."

102.   Mr. Garst also told Plaintiff she would be an interim Billing Supervisor and would have to prove herself.

103.   Caucasian employees have not been required to work on an interim basis when promoted to a supervisory position.

104.   When Plaintiff received the Billing Supervisor positions she was required to perform the functions of both billing and follow-up.

105.   Ms. Boyd, the Caucasian individual Mr. Garst wanted to receive the Billing Supervisor position, was placed to work under Plaintiff's supervision. However, even though Ms. Boys was not a supervisor she was given supervisory pay making more than Plaintiff, her supervisor.

106.   Mr. Garst also awarded Ms. Boyd pay raises when Plaintiff was denied a raise.

107.   Plaintiff complained to Mr. Garst about being treated less favorably

than Ms. Boyd, Caucasian, because Ms. Boys received a pay raise when she had not received a raise in years.

108.   Plaintiff also complained to Mr. Garst about Ms. Boyd receiving supervisor's pay when she was not a supervisor.

109.   Ms. Boyd was paid more than Plaintiff and given pay raises because she is Caucasian and Plaintiff is African American.

110.   Mr. Garst hired David Sawyer, Caucasian, to work under the supervision of William Whatley, African American.  Mr. Sawyer was paid more than his African American supervisor, Mr. Whatley, because he was Caucasian and Mr. Whatley is African American.

111.   In or around December 2014, Plaintiff's immediate supervisor was Connie Henry, Assistant Director of Claims Processing. Ms. Henry's supervisor was Mr. Garst.

112.   In or around late December 2014, Ms. Henry informed Plaintiff that Mr. Garst wanted to discipline Plaintiff up for allegedly intimidating a coworker. During this meeting Plaintiff complained to her immediate supervisor, Ms. Henry, about race discrimination and being denied positions given to Caucasians.

113.   Ms. Henry refused to discipline Plaintiff because the allegation was unfounded.

114.   When it came time for Plaintiff's six-month performance evaluation

and pay raise, Mr. Garst kept making excuses as to why he could not perform Plaintiff's evaluation.

115.  Plaintiff's evaluation was finally performed and Mr. Garst directed Ms. Henry to give Plaintiff lower marks on her evaluation than she deserved.

116.  Ms. Henry refused and Mr. Garst removed Ms. Henry as Plaintiff's supervisor and Placed Plaintiff under his direct supervision.

117.  In or around June 2015, after Mr. Garst took over as Plaintiff's immediate supervisor, Plaintiff was required to take over the supervision of half of Caucasian supervisor Sherry Burrus' department.

118.  Even though Plaintiff was required to perform Ms. Burrus' supervisory duties Plaintiff was still paid approximately $10,000.00 a year less than Ms. Burrus.

119.  On or about February 2, 2016, Plaintiff was approved to work from home due to inclement weather.

120.  While working from home, Plaintiff prepared numerous reports and attempted to generate those reports to her subordinates.

121.  Plaintiff was unable to deliver the reports due to computer network problems. Plaintiff notified Defendant's IT Department of the network problems. Plaintiff also performed additional tasks while working from home on this occasion.

122.   On or about February 3, 2016, Plaintiff met with Human Resources and complained about the racial discrimination and not receiving a pay increase.

123.   After Plaintiff's complaints to Human resources Mr. Garst began unjustly harassing Plaintiff about her job performance.

124.   On or about March 18, 2016, Plaintiff was terminated and accused of "theft of time" when she worked from home on February 2, 2016.

125.   Plaintiff did not steal time and performed her duties while working form home.

126.   Plaintiff was terminated because of her race.

127.   Defendant subjected Plaintiff to racial discrimination and a racially hostile working environment because of her race.

128.   Plaintiff has been unjustly disciplined, subjected to racially offensive comments, forced to work in a racially hostile environment, discriminated against, treated differently, denied pay, harassed, and terminated by Defendant because of her race, African American.

129.   Defendant has a habit and/or practice of discriminating against African-Americans, harassing African Americans and condoning and/or allowing racial discrimination and a racially hostile environment.

130.   Supervisors and managers employed by Defendant engaged in these unlawful practices were aware these unlawful practices by other employees,

encouraged and/or condoned these unlawful practices.

131. Defendant failed to train its employees on its purported antidiscrimination/antiharassment policies and reporting procedures.

132. Defendant's dissemination and enforcement of any antidiscrimination/antiharassment policies and reporting procedures has been ineffective.

133. Plaintiff has been directly affected by the racially discriminatory and racially harassing practices described in this Complaint.

134. Defendant's conduct and the conduct of its employees was so severe or pervasive as to create a racially discriminatory and hostile working environment to which Plaintiff was subjected.

135. Defendant knew or should have known of the racial discrimination and racial harassment Plaintiff was forced to endure.

136. Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention of and/or remedy of the racial discrimination and racial harassment/hostile environment Plaintiff was forced to endure.

137. Defendant's actions were and continue to be malicious and Plaintiff has been harmed.

138. Defendant's actions were and continue to be in reckless disregard of Plaintiff's federally protected rights.

139.   Defendant's actions are in violation of Title VII of the "Civil Rights Act of 1964," as amended and 42 U.S.C. § 1981, as amended.

140.   The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit for back pay, front pay, compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is her only means of securing adequate relief.

141.   Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices set forth herein unless enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that this Court adopt jurisdiction of this action and award Plaintiff the following relief:

a.      Enter a declaratory judgment that Defendant's policies, practices and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII of the "Civil Rights Act of 1964," as amended, and 42 U.S.C. § 1981, as amended;

b.      Grant Plaintiff a permanent injunction enjoining Defendant's, their Agents, Successors, Employees, Attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII of the "Civil Rights

of 1964," as amended, and 42 U.S.C. § 1981, as amended;

c.      Grant Plaintiff an Order requiring Defendant make her whole by granting appropriate declaratory relief, compensatory damages (including damages for mental anguish), punitive damages, interest, attorney's fees, expenses, costs; and

d.      Plaintiff prays for such other, further, different or additional relief and benefits as justice may require.

## COUNT TWO

## STATEMENT OF PLAINTIFF'S TITLE VII AND 42 U.S.C. § 1981 RETALIATION CLAIMS

142.   Plaintiff adopts and realleges paragraphs one (1) through one hundred forty-one (141) as if fully set forth herein.

143.   Plaintiff, Tamela Cosper is an African American female.

144.   Plaintiff began working for the Defendant on or about July 16, 2012, as a Reimbursement Specialist.   On or about June 29, 2014, Plaintiff was reclassified to Billing Specialist

145.   Plaintiff was terminated on or about March 18, 2016.

146.   Plaintiff's Caucasian supervisor was Mark Garst, Director of Patient Billing.

147.   Over   the   course   of   Plaintiff's   employment   with   Defendant,

promotional positions were available for which Plaintiff qualified.

148.   Plaintiff applied for numerous promotional positions but Mr. Garst denied Plaintiff the opportunity to interview for these positions.

149.   Less qualified Caucasian applicants with less experience than Plaintiff were hired for the promotional positions Plaintiff was denied.

150.   In late 2012, Plaintiff complained to Human Resources about the unfair racial treatment and after her complaints Mr. Garst was required to interview Plaintiff when she applied for a position.

151.   Plaintiff applied for additional promotional positions after she complained and was interviewed by Mr. Garst.

152.   Mr. Garst was very hostile toward Plaintiff when she was interviewed.

153.   Even though Plaintiff was finally awarded an interview, she was not hired to fill any of the promotional positions and less qualified Caucasians continued to be awarded the positions.

154.   In or around 2013, the position of Billing Supervisor was available and Plaintiff applied.

155.   Although Plaintiff was more qualified, the position was give to Talisa Rogers, Caucasian. Plaintiff was denied this position of Billing Supervisor because of her race.

156.   Ms. Rogers later resigned, and Plaintiff applied for the Billing

Supervisor position again. Plaintiff was denied the position because of her race and the position was awarded to Sherry Burrus, Caucasian.

157.   Later, another Billing Supervisor position became open and available, but Mr. Garst did not advertise or post the position in an attempt to prevent Plaintiff from applying.

158.   Mr. Garst promised the position to Cassandra Boyd, Caucasian.

159.   Plaintiff learned of the available Billing Supervisor position and applied.

160.   Plaintiff complained to Mr. Garst about him favoring Caucasian employees and informed him that she was qualified for the Billing Supervisor position he promised to Ms. Boyd. Plaintiff also complained to Mr. Garst that she was being treated unfairly because he continued to overlook her for promotions that were awarded to Caucasians.

161.   Plaintiff was reluctantly given the Billing Supervisor position on or about July 13, 2014.

162.   However, Mr. Garst tried to prevent Plaintiff from applying and told Plaintiff, "I can't find a legitimate reason not to hire you for the job, but if you'll not apply, I'll give you a raise."

163.   In his further attempts to prevent Plaintiff from applying for the Billing Supervisor position Mr. Garst told Plaintiff, "Welcome to the world of

getting screwed being on salary."

164. Mr. Garst required Plaintiff to work as an interim Billing Supervisor when she was first promoted.

165. Caucasian employees were not required to work as interim supervisors when they were promoted.

166. Ms. Boyd was placed under Plaintiff's supervision, but was given supervisor's pay and was paid more than Plaintiff, her immediate supervisor.

167. Mr. Garst was awarded a pay raise when Plaintiff was denied a pay increase.

168. Plaintiff complained to Mr. Garst about Ms. Boyd receiving a pay raise when she had not received a raise in years.

169. Plaintiff also complained to Mr. Garst about Ms. Boyd being paid more money then her and Ms. Boyd receiving supervisory pay.

170. Mr. Garst hired David Sawyer, Caucasian to work for William Whatley, African American, and Mr. Sawyer was paid more than his African American supervisor, Mr. Whatley, because he was Caucasian and Mr. Whatley is African American.

171. After Plaintiff was finally promoted to Billing Supervisor she was required to perform the functions of both billing and follow-up.

172. In or around December 2014, Plaintiff met with her immediate

supervisor, Connie Henry, Assistant Director of Claims Processing. Ms. Henry also reported to Mr. Garst.

173. Ms. Henry informed Plaintiff that Mr. Garst wanted to discipline Plaintiff up for allegedly intimidating a coworker.

174. Ms. Henry refused to discipline Plaintiff because the allegation was unfounded. During this meeting Plaintiff complained to her immediate supervisor, Ms. Henry, about race discrimination and being denied positions given to Caucasians.

175. In or around 2015, when it came time for Plaintiff's six month evaluation and pay raise, Mr. Garst kept giving excuses as to why he could not perform Plaintiff's evaluation.

176. When Plaintiff's evaluation was finally performed, Mr. Garst directed Ms. Henry to give Plaintiff lower evaluation scores and when Ms. Henry refused Mr. Garst removed Ms. Henry as Plaintiff's supervisor.

177. Mr. Garst then took over as Plaintiff's immediate supervisor.

178. In or around June 2015, Plaintiff was required to take over supervisory responsibility for half of Sherry Burrus' department. Plaintiff continued to be paid approximately $10,000.00 a year less than Ms. Burrus.

179. On or about February 2, 2016, Plaintiff was approved to work from home due to inclement weather.

180. While working from home, Plaintiff created numerous reports.

181. Plaintiff was unable to deliver the reports due to computer network problems, and Plaintiff notified Defendant's IT Department of the network problems.

182. Plaintiff performed additional tasks while working from home.

183. On or about February 3, 2016, Plaintiff complained again to Human resources about being denied a pay raise when Caucasian employees performing the same or similar duties were awarded pay raises and were paid more than Plaintiff.

184. After Plaintiff complained to Human Resources on February 3, 2016, Mr. Garst began unjustly harassing Plaintiff about her job performance.

185. On March 18, 2016, Mr. Garst terminated Plaintiff and falsely accused Plaintiff of stealing time when she was working from home on February 2, 2016.

186. Plaintiff performed work on February 2, 2016, and did not steal time.

187. Plaintiff was terminated in retaliation for her complaints and protected activity and there is a causal connection between Plaintiff protected activity and her termination.

188. Plaintiff suffered additional adverse actions in retaliation for her complaints and protected activity.

189.   Defendant has a habit and/or pattern of retaliation.

190.   Defendant subjected Plaintiff to adverse treatment with respect to the terms and conditions of her employment and terminated Plaintiff in retaliation for her complaints and protected activity.

191.   There is a causal connection between Plaintiff's complaints and the adverse actions she has been forced to endure.

192.   Plaintiff has been unjustly disciplined, denied pay, harassed, and terminated in retaliation for her complaints and protected activity.

193.   Supervisors and managers employed by Defendant engaged in these unlawful retaliatory practices, encouraged and/or condoned these unlawful practices.

194.   Defendant failed to train its employees on its purported antiretaliation policies and reporting procedures.

195.   Defendant's dissemination of any antiretaliation policies and reporting procedures has been ineffective.

196.   Plaintiff has been directly affected by the retaliatory practices described in this Complaint.

197.   Defendant's conduct and the conduct of its employees were so severe or pervasive as to create a retaliatory harassing working environment to which Plaintiff was subjected.

198.   Defendant knew or should have known of the retaliation Plaintiff was forced to endure.

199.   Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention of and/or remedy of the retaliation Plaintiff was forced to endure.

200.   Defendant condoned the illegal retaliation.

201.   Defendant's retaliatory actions discouraged employees from complaining and engaging in protected activity.

202.   Defendant's actions were and continue to be malicious and Plaintiff has been harmed.

203.   Defendant's actions were and continue to be in reckless disregard of Plaintiff's federally protected rights.

204.   Plaintiff has been unjustly harassed, unjustly disciplined, denied pay, disciplined and retaliated against, and terminated for engaging in a protected activity, and that there is a causal link between Plaintiff engaging in a protected activity and the adverse actions she suffered, including her termination.

205.   Plaintiff has been retaliated against in violation of Title VII of the "Civil Rights Act of 1964," as amended, and 42 U.S.C. § 1981, as amended.

206.   Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for back pay, front pay, compensatory

damages, punitive damages, attorney's fees, injunctive relief and declaratory judgment is his only means of securing adequate relief.

207.   Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court adopt jurisdiction of this action and award Plaintiff the following relief:

a.      Enter a declaratory judgment that Defendant's policies, practices and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII of the "Civil Rights Act of 1964," as amended, and 42 U.S.C. § 1981, as amended;

b.      Grant Plaintiff a permanent injunction enjoining Defendant's, their Agents, Successors, Employees, Attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII of the "Civil Rights of 1964," as amended, and 42 U.S.C. § 1981, as amended;

c.      Grant Plaintiff an Order requiring Defendant make her whole by granting appropriate declaratory relief, compensatory damages (including damages for mental anguish), punitive damages, interest, attorney's fees, expenses, costs; and

     d.     Plaintiff prays for such other, further, different or additional relief and

benefits as justice may require.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

                                    CYNTHIA FORMAN WILKINSON
                                    State Bar ID No.:  ASB-9950-L68C
                                    Attorney for Plaintiff

**OF COUNSEL:**
**WILKINSON LAW FIRM, PC**
215 N. Richard Arrington Jr. Blvd.
Suite 200
Birmingham, Alabama 35203
Tel.:  (205) 250-7866
Fax:  (205) 250-7869
E-mail: wilkinsonefile@wilkinsonfirm.net

                                    /s/ Richard A. Bearden
                                    RICHARD A. BEARDEN
                                    State Bar ID No.: ASB-0873-E41R
                                    Attorney for Plaintiff

**OF COUNSEL:**
**MASSEY, STOTSER & NICHOLAS, PC**
1780 Gadsden Highway
Birmingham, AL 35235
Tel.:  (205) 838-9000
Fax:  (205) 838-9071
E-mail:  rbearden@msnattorneys.com

**PLAINTIFF'S ADDRESS:**
Ms. Tamela Cosper
c/o WILKINSON LAW FIRM, PC
215 North Richard Arrington, Jr. Blvd.
Suite 200
Birmingham, Alabama 35203

**PLEASE SERVE DEFENDANT AT THE FOLLOWING ADDRESS:**

American Family Care
c/o D. Bruce Irwin
2147 Riverchase Office Road
Hoover, AL 35244